**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**KELLY KING**

               **Plaintiff,**            **CIVIL ACTION NO. 06-CV-10051-DT**

      **vs.**                      **DISTRICT JUDGE JOHN FEIKENS**

**COMMISSIONER OF**            **MAGISTRATE JUDGE MONA K. MAJZOUB**
**SOCIAL SECURITY,**

              **Defendant.**
_____/

**REPORT AND RECOMMENDATION**

**I.**    **RECOMMENDATION**

       This Court recommends that Defendant's Motion for Summary Judgment be **GRANTED**
(Docket # 15), that Plaintiff's Motion for Summary Judgment be **DENIED** (Docket # 10), and that
Plaintiff's complaint be **DISMISSED.**

**II.**    **PROCEDURAL HISTORY**

       This is an action for judicial review of the final decision by the Commissioner of Social
Security that the Plaintiff was not "disabled" for purposes of the Social Security Act.  42 U.S.C. §§
423, 1382.  The issue for review is whether the Commissioner's decision is supported by substantial
evidence.

       Plaintiff Kelly King filed an application for Supplemental Security Income (SSI) and
Disability Insurance Benefits (DIB) in September 2000.  (Tr. 71-74, 357-61).  She alleged she had
been disabled since March 31, 1999 due to fibromyalgia and bipolar disorder.[1]  *Id.*  Plaintiff's claims

_____

[1]     Plaintiff filed prior DIB and SSI claims, which were denied on March 30, 2000.
(Tr. 373).  The decision was affirmed upon appeal.  (Tr. 368-69).  ALJ Jones determined that

were initially denied in March 2001. (Tr. 57-61, 362-66). Plaintiff sought a review hearing before

an Administrative Law Judge (ALJ). (Tr. 62). A hearing took place before ALJ Douglas N. Jones

on July 29, 2002. (Tr. 550-77). ALJ Jones denied Plaintiff's claims in an opinion issued on

September 25, 2002. (Tr. 370-83). Plaintiff requested review and on August 29, 2003 the Appeals

Council granted her request, vacated ALJ Jones' decision, and remanded the matter for further

proceedings.[2] (Tr. 388-89).

A second hearing was held before ALJ Jones on March 12, 2004. (Tr. 578-98). Plaintiff was

represented at the hearing. (Tr. 578). ALJ Jones denied Plaintiff's claims for a second time on

October 21, 2004. (Tr. 24-35). Plaintiff appealed. (Tr. 22-23). The Appeals Council denied review

and the ALJ's decision is now the final decision of the Commissioner. (Tr. 9-21). Plaintiff appealed

the denial of her claims to this Court, and both parties have filed motions for summary judgment.

III.    **MEDICAL HISTORY**

    **1.**    **Plaintiff's Treatment for Physical Impairments**

Dr. R. Scott Lazzara performed a consultative examination of Plaintiff in February

2001 at the request of the state agency. (Tr. 207-10). Plaintiff reported to Dr. Lazzara that she

could sit for one hour, stand for 30 minutes, and walk for 15 minutes. She also stated that on a good

---

there was no basis for re-opening these claims and found that, under the doctrine of res judicata,
the relevant time period at issue for the pending claims began on March 31, 2000. (Tr. 28).
Furthermore, he found that Plaintiff's insured status expired on March 31, 2001. Therefore, the
relevant time period for her DIB application began March 31, 2000 and ended on March 31,
2001. Plaintiff does not challenge these determinations.

[2]     The case was remanded with directions to obtain additional evidence concerning
Plaintiff's fibromyalgia, including medical records from Plaintiff's treating sources and medical
source statements from a consultative examiner, preferably a rheumatologist if warranted and
available, regarding what Plaintiff could still do despite her impairments. (Tr. 389).

2:06-cv-10051-JF-MKM   Doc # 16   Filed 01/30/07   Pg 3 of 23   Pg ID 673

day she could lift 40 pounds but only 10 pounds on a bad day. (Tr. 207). Dr. Lazzara observed that Plaintiff walked normally without an assistive device. (Tr. 208). Upon examination, Plaintiff had a normal range of motion in all major joints and she had no difficulty getting on or off of the examination table, walking heel and toe, squatting, or hopping. Plaintiff had full, bilateral fist and grip strength, intact dexterity, full reflexes, and intact sensations. She could pick up a coin and button and open a door with either hand. (Tr. 209-10). Dr. Lazzara also noted that there was no evidence of trigger points, reflexive changes, sensorineural deficits, or muscle atrophy. He concluded that Plaintiff had no obvious physical detriments. (Tr. 210).

Plaintiff was examined by Dr. Margarethe Macuilus in May 2001. Plaintiff had a good range of motion in her cervical and lumbar spine although she did have a positive straight leg raising test on the right at 90 degrees. (Tr. 261). Dr. Macuilus also noted tender points consistent with fibromyalgia. *Id.*

In March 2001 Plaintiff was evaluated at the Sleep Disorder Clinic by Dr. J.M. Buday. Plaintiff reported that she had difficulty in maintaining sleep and that she never felt refreshed. (Tr. 269). A physical examination revealed no problems with coordination, gait, or station. Dr. Buday recommended that Plaintiff stop taking her Neurontin and Wellbutrin while pregnant. He also recommended that Plaintiff not take any other medications or try any behavioral techniques to address her sleeping difficulties until after her pregnancy. (Tr. 270).

An x-ray taken of Plaintiff's thoracic spine in February 2003 was negative for any abnormalities. (Tr. 456). Plaintiff reported to Dr. Macuilus in February and March 2003 that Paxil was helping. (Tr. 452-53).

-3-

Plaintiff underwent a consultative physical examination in December 2003 performed by Dr. Joseph Craig. (Tr. 498-505). Upon examination, Plaintiff's gait was essentially normal although a slightly mild antalgic gait pattern was seen on the left. (Tr. 499, 500). She demonstrated an ability to heel, toe, and heel-to-toe walk and she did not need an assistive device. Plaintiff also had a fair ability to squat and recover from the squatting position. (Tr. 499). Plaintiff's range of motion in her lumbar spine was within normal limits, a straight leg raising test was negative, and no active spasms were noted in her spine. (Tr. 500, 504). She also had the ability to perform fine and gross dexterity skills, such as buttoning clothes, tying shoes, picking up a coin or pencil, and writing, and she had good grip strength. (Tr. 500). Dr. Craig noted, however, that Plaintiff had tender trigger and/or tender points in her upper and lower extremities consistent with fibromyalgia. *Id.*

Dr. Craig thereafter completed a physical capacity evaluation. (Tr. 506-09). He opined that Plaintiff could: (1) lift/carry 20 pounds occasionally and 10 pounds frequently; (2) stand/walk/sit for about 6 hours in an 8-hour workday; (3) never climb; (4) occasionally balance, kneel, crouch, crawl, stoop; and (5) frequently reach in all directions, including overhead. (Tr. 506-08). He further concluded that Plaintiff was limited in her ability to push/pull with her upper and lower extremities and that she should have limited exposure to vibration, humidity/wetness, and hazards. (Tr. 507, 509).

Plaintiff was evaluated at the Sleep Disorder Center for a second time by Dr. Buday in April 2003. (Tr. 511-12). Dr. Buday believed that Plaintiff's bipolar disorder was a possible factor in her inability to initiate and maintain sleep. (Tr. 512). He also noted that her medical history was complicated by her lack of a regular sleep schedule. Plaintiff did not have a regular sleep onset and awakening time and she napped during the day. *Id.* Dr. Buday concluded that Plaintiff was not a

-4-

good candidate for the sleep study program because there were no symptoms suggestive of sleep apnea. He recommended that Plaintiff try a sleep hypnotic drug and that she be given a lower dosage of Neurontin, which she could take on a more frequent basis. Dr. Buday also advised Plaintiff to work on proper sleeping habits and provided with her literature on the subject. *Id.*

### 2.   **Plaintiff's Treatment for Mental Impairments**

Plaintiff was seen by Dr. Lawrence Harrelson, a psychologist, in May 2000 complaining of depression, high anxiety, obsessive rumination, and chronic pain related to her fibromyalgia, which caused her to wake up frequently during the night. (Tr. 250, 254-55). Plaintiff also reported that she had quit work at Goodwill because of the pain. (Tr. 254). Dr. Harrelson diagnosed Plaintiff with dysthymic disorder and assigned her a Global Assessment of Functioning ("GAF") score of 50. Plaintiff reported that she was sleeping better in June 2000 after having increased her dosage of Paxil but that she had difficulty confronting people. (Tr. 253). In July 2000 Plaintiff stated that she felt she was doing better since therapy began. (Tr. 248). She also told Dr. Harrelson that she was babysitting her sister's two children. *Id.* Dr. Harrelson started Plaintiff on Wellbutrin in July 2000. Her original dosage was cut-down when Plaintiff reported feeling "spacey." (Tr. 246). On July 27, 2000 Plaintiff reported that her medication was working well. (Tr. 245).

In August 2000 Plaintiff reported that she had more self-esteem but that she still felt stressed and overwhelmed by minor stressors. (Tr. 245). Plaintiff told Dr. Harrelson that the Wellbutrin caused nausea but that she was sleeping well. (Tr. 244). However, she still felt hyper, impatient, and forgetful. *Id.* Dr. Harrelson reported in October 2000 that he last saw Plaintiff on August 8, 2000. Although Plaintiff was scheduled for another appointment, she failed to appear. (Tr. 275).

-5-

Plaintiff was examined by state agency consultant and licensed psychologist, Dr. Anne Date, in November 2000.  Plaintiff reported to Dr. Date that her chronic pain and inability to work had interfered with her family relationships because she was always irritable.  She stated that pain kept her from working and, depending upon the day, could only stand for 3 hours.  She also needed frequent breaks.  Plaintiff also complained of anxiety, panic attacks, and depression.  (Tr. 199-200). Plaintiff reported that she got along well with her family and Dr. Date noted that Plaintiff appeared to be a fairly well adjusted person socially.  (Tr. 201).  Plaintiff's daily activities included getting up in the morning, taking her son to school around the corner from her home, returning home to make the beds and wash the dishes.  (Tr. 202).  Plaintiff reported that she was too sore to do anything else afterwards.  *Id.*

Dr. Date noted that Plaintiff's reality testing and insight were adequate.  Plaintiff's judgment was good.  She appeared to be autonomous and motivated but her motivation was compromised by her medical problems.  (Tr. 202).  Dr. Date did not believe that Plaintiff was exaggerating her symptoms.  *Id.*  Plaintiff's speech and thought process were spontaneous, relevant, logical, adequately organized, and sequential.  (Tr. 203).

Dr. Date diagnosed Plaintiff with pain disorder, panic disorder without agoraphobia, and major depressive disorder.  (Tr. 205).  She assigned Plaintiff a GAF score of 54 with a guarded prognosis absent a change in Plaintiff's medical condition.  (Tr. 206).

Plaintiff returned to Dr. Harrelson on January 30, 2001.  Plaintiff stated that she stopped taking Wellbutrin in September because she did not believe that it helped.  (Tr. 242). Plaintiff's speech was accelerated and pressured and her mood was irritable, anxious, and mildly depressed. *Id.* Plaintiff also reported difficulties concentrating, distractability, poor memory, and hyperactivity.

*Id.* Dr. Harrelson diagnosed Plaintiff with pain and attention deficit hyperactivity disorder with a history of panic attacks. *Id.*

In February 2001 Plaintiff told Dr. Harrelson that she wanted disability because she believed she deserved it due to her fibromyalgia. She also stated that her attorney had originally wanted her to see him for an IQ test since she had been in special education classes. Dr. Harrelson informed Plaintiff that she would not be eligible for disability on the basis of her mental status. (Tr. 238). Dr. Harrelson rated the severity of Plaintiff's psychological stress as mild. (Tr. 240).

Plaintiff's mental treatment records were reviewed by Dr. Ronald Marshall, state agency examiner, in February 2001. Dr. Marshall concluded that Plaintiff had an affective disorder (major depression), an anxiety-related disorder (panic disorder), and a somatoform disorder (pain disorder) which resulted in mild restrictions of activities of daily living and moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace. (Tr. 214, 216-17, 221). Dr. Marshall also completed a mental capacity assessment form in which he noted that Plaintiff had moderate limitations in her ability to: (1) carry out, understand, and remember detailed instructions; (2) maintain attention and concentration for extended periods; (3) interact with the general public; and (4) accept instructions and respond appropriately to criticism from supervisors. (Tr. 225-26). Dr. Marshall noted that Plaintiff was capable of unskilled work. (Tr. 229).

In April 2001 Plaintiff reported to Dr. Harrelson that she had a panic attack in the waiting room and that she felt overwhelmed by environmental stressors, including her recent pregnancy. (Tr. 235, 231). Dr. Harrelson rated the severity of Plaintiff's psychological stress as moderate. (Tr. 232).

Plaintiff was referred to List Psychological Services in January 2002 for mental health treatment where she was assigned a therapist. (Tr. 323, 331, 338). Plaintiff reported in February

-7-

2002 that she was taking Wellbutrin, which helped her think more clearly. (Tr. 351). She was assigned a GAF score of 55. *Id.*

Plaintiff's therapist referred her to a psychiatrist, Dr. Barry Binkley, who evaluated Plaintiff in March 2002. (Tr. 325-28). Dr. Binkley diagnosed Plaintiff with bipolar disorder and a developmental reading and math disorder. (Tr. 327). He assigned her GAF score of 50. *Id.*

Dr. Binkley filled out a mental impairment questionnaire in May 2002. (Tr. 309-313). Dr. Binkley diagnosed Plaintiff with bipolar disorder and he assigned her a GAF score of 55. He noted that Plaintiff would not have difficulty working at a regular job on a sustained basis due to her mental condition. (Tr. 312). He also opined that Plaintiff had moderate restrictions of activities of daily living, moderate difficulties in maintaining social functioning, and often had deficiencies of concentration, persistence, or pace. (Tr. 312-13).

In June 2002 Plaintiff's GAF score remained at 55. (Tr. 340). Follow-up records indicate that Plaintiff began to receive her medication through her family doctor and that she had not been to therapy since July 2002. (Tr. 443).

Plaintiff stated to her therapist in October 2002 that she wanted to resume treatment with Dr. Douglas Foster who treated her in 1998, rather than Dr. Binkley. She did not believe that Dr. Binkley helped her. (Tr. 440, 442, 469). However, Plaintiff resumed treatment with her therapist at List Psychological Services. On October 21, 2002 Plaintiff told her therapist that she was feeling better and that she thought her fibromyalgia was in remission. (Tr. 439).

Plaintiff had her first meeting with Dr. Foster on November 11, 2002. He diagnosed Plaintiff with major depression and assigned her a GAF score of 48. (Tr. 469-71). Plaintiff also reported to her therapist that her remission was over but that she was taking a new medication for her

-8-

fibromyalgia that was a "life-saver." (Tr. 437). Plaintiff also reported that the Paxil prescribed by Dr. Foster seemed to be working. (Tr. 434).

Plaintiff returned to Dr. Foster in January 2003. He noted that Plaintiff slept during the day and therefore had trouble sleeping at night. (Tr. 520). Dr. Foster advised Plaintiff to try to stay awake for 36 hours and then go to bed when she wanted so that she could try to re-structure and re-stabilize her sleeping pattern. *Id.* Dr. Foster reported that Plaintiff was doing better and that her depression and anxiety were lifting. (Tr. 468, 520). He noted, however, that Plaintiff was not mixing with crowds or people outside of her home so it was difficult to gauge her improvement in social anxiety. (Tr. 468). Dr. Foster suggested that Plaintiff increase her Paxil dosage but Plaintiff declined. *Id.*

In February 2003 Dr. Foster noted that Plaintiff was doing better but still had a major problem with isolation. (Tr. 467). Plaintiff stated that she isolated herself because of her panic attacks. *Id.* Plaintiff reported that she took her Paxil at night because it made her sleepy. Dr. Foster advised Plaintiff to take the same dosage of Paxil in the morning and a smaller dosage at 4:00 p.m. *Id.*

Plaintiff reported to Dr. Foster in April 2003 that she was having mood swings. Her physician had given her Neurontin for her chronic pain after which Plaintiff cleaned the house and was very energetic. (Tr. 466). Plaintiff's husband told her to slow down and she stopped taking the Neurontin. Dr. Foster now believed that Plaintiff had bipolar disorder. He advised her to resume the Neurontin on a regular basis in the afternoon because Plaintiff reported that it made her drowsy and she was home alone with her baby. However, the medication sometimes made her drowsy so she could not take it in the morning because she was home alone with the baby. *Id.* Dr. Foster also

noted that Plaintiff had not experienced any adverse symptoms from the use of the medication. *Id.*
Plaintiff's therapist at List Psychological Services noted in April that Plaintiff had dropped out of
treatment, which she had been attending sporadically. Plaintiff subsequently cancelled follow-up
appointments. (Tr. 525-28). Plaintiff was thereafter terminated from List for failure to appear for
treatment. (Tr. 523).

Dr. Marshall completed a second review of Plaintiff's medical records in April 2003. (Tr.
480-97). He noted that Plaintiff was moderately limited in her ability to: (1) understand, remember,
and carry out detailed instructions; (2) maintain attention and concentration for extended periods,
(3) perform activities within a schedule, maintain regular attendance, and be punctual within
customary tolerances; (4) interact appropriately with the general public; and (5) accept instructions
and respond appropriately to criticism from supervisors. (Tr. 480-81). Nevertheless, Dr. Marshall
concluded that Plaintiff retained the ability to perform unskilled work on a sustained basis, noting
that Plaintiff might do better with minimal contact with the public and that she might have difficulty
with completing tasks. (Tr. 496).

Plaintiff returned to Dr. Foster in July 2003. Plaintiff reported that she was kicking her legs
all night, which disrupted her sleep and she continued to experience low self-esteem. Plaintiff
requested a new therapist stating that her other therapist was not helping. (Tr. 519). Dr. Foster
prescribed medicine for Plaintiff's legs, referred Plaintiff to another therapist, and scheduled another
review session in 8 weeks. *Id.*

Dr. Foster next saw Plaintiff in September 2003. (Tr. 518). He noted that Plaintiff was
doing fairly well but was not "100%". Plaintiff reported that the Neurontin was making her "very,
very drowsy". Therefore, Dr. Foster reduced Plaintiff' dosage of Neurontin and prescribed

-10-

Topamax.  Her Paxil medication was continued.  *Id.*  The next and last treatment record of Dr. Foster's is dated March 2004.  (Tr. 536).  He noted that Plaintiff still had difficulty sleeping in part due to her need to care for her infant.  Dr. Foster also reported that the Paxil and Neurontin were helping with Plaintiff's fibromyalgia, depression, bipolar disorder, and mood swings.  He was reluctant to prescribe a night-time sleep aid because the problem was not lack of sleep but sleep that was disrupted and at the wrong time.  *Id.*

## IV.   HEARING TESTIMONY

### A.   Plaintiff's Testimony

#### 1.   Hearing on July 29, 2002

Plaintiff was born in December 1972 and had an 8th grade education.  (Tr. 554).  She stopped working at the Goodwill in March 1999.  (Tr. 555).  Plaintiff testified that she was unable to work due to her fibromyalgia, depression, nervousness, forgetfulness, and pain.  (Tr. 558).  As a result of her condition, Plaintiff stated that she would lay down at least 3 or 4 times per day for 10 minutes to a ½ hour.  (Tr. 559).  She indicated that she would get 5 to 6 hours of disrupted sleep per night.  (Tr. 560).  Standing and sitting for too long was painful.  *Id.*  Plaintiff estimated that she could tolerate sitting for ½ hour to 1 hour and stand for a ½ hour to 45 minutes.  (Tr. 566).  She believed she could walk for about 2 blocks before she needed to rest.  (Tr. 567).  Plaintiff could lift her baby who was 20-21 pounds but she could not hold him for very long.  *Id.*

Plaintiff also told the ALJ that her depression had caused a loss of appetite.  She was irritable and she had panic attacks about once every three months, which lasted about 2 hours.  (Tr. 562-63).  Due to an inability to concentrate, Plaintiff testified that she could not always

-11-

comprehend what she read.  (Tr. 564).  Plaintiff stated that she also had crying spells at least 3 times per week although therapy helped a lot.  (Tr. 565-66).  Plaintiff also testified that she took Wellbutrin for her depression but that it did not help.  (Tr. 561, 568).  She stated that she had not told her current doctor that her medicine was ineffective but that she planned on telling him at her next appointment.  (Tr. 568-69).

When asked about her daily activities, Plaintiff testified that she could do dishes and make the bed but needed to take breaks.  (Tr. 565).  Plaintiff testified that she had a driver's license and drove about 20 times per week.  (Tr. 557).

## 2.      March 12, 2004 Hearing

Plaintiff testified that she took medication on a daily basis and that her new medication caused drowsiness, sleepiness, numbness, and forgetfulness.  (Tr. 584).  She stated that she still had pain during the night and consequently did not sleep well.  *Id.*  Plaintiff would sometimes sleep on the floor because it was the most comfortable.  (Tr. 585).  She also stated that stretching, lifting up her legs in the air, and hitting the back of her legs with her hands helped to alleviate her pain and muscle spasms.  (Tr. 586).  Plaintiff testified that she would lay on the floor and stretch her legs at least 3 to 4 times per day for 15 to 20 minutes. *Id.*  Plaintiff estimated that she also took at least 2 naps a day for about 1 to 2 hours.  *Id.*

When asked about how much she could lift, Plaintiff stated that she could not lift her two-year old child and that it was sometimes difficult to carry a gallon of milk because it bothered her back.  (Tr. 585).  Plaintiff stated that she also had pain, numbness, and tingling in her hands.  (Tr. 589).  She could not open jars and sometimes had difficulty buttoning and

-12-

zipping her clothes.  *Id.*  Plaintiff stated that she had not showered for three days prior the hearing because of pain and fatigue.  *Id.*

> **B.**     **Vocational Expert's Testimony**

Ms. Mary Williams, a rehabilitation counselor, testified as a vocational expert at the March 2004 hearing.  (Tr. 392, 592-98).  The ALJ asked Ms. Williams what jobs would be available in Michigan's lower peninsula for a hypothetical individual of Plaintiff's age, education, and work history who was able to perform sedentary work that had a sit/stand at-will option.  Additionally, the hypothetical individual could only occasionally:  (1) use foot controls; (2) bend at the waist and knees; (3) kneel; (4) climb stairs; (5) reach forward and overhead; (6) be exposed to high humidity or wet working environments; and (7)  interact with supervisors. Furthermore, the individual could not: (1) crawl; (2) climb ladders; (3) be exposed to unprotected heights or hazardous, uncovered machinery; (4) use vibrating tools; (5) engage in forceful or sustained gripping or grasping; (6) follow detailed instructions; (7) concentrate for extended periods of time; or (8) do fast-paced work.  The hypothetical individual would also need to have only occasional changes in work settings or procedure and could not perform any job that required more than an occasional need for independent planning or decision-making. (Tr. 593-94).

Ms. Williams testified that such an individual could perform several unskilled jobs, including 1,780 inspector positions, 1,050 sorter positions, and 1,570 surveillance system monitor positions.  (Tr. 594).

**V.**     **LAW AND ANALYSIS**

A.    **STANDARD OF REVIEW**

Title 42 U.S.C. § 405(g) gives this Court jurisdiction to review the Commissioner's decisions.  Judicial review of those decisions is limited to determining whether her findings are supported by substantial evidence and whether she employed the proper legal standards.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997).  Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson,* 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  It is not the function of this court to   try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility.  *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

In determining whether substantial evidence supports the Commissioner's decision, the Court must examine the administrative record as a whole.  *Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).  If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even where substantial evidence also supports the opposite conclusion and the reviewing court would decide the matter differently.  *Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999).

B.    **FRAMEWORK OF SOCIAL SECURITY DISABILITY DETERMINATIONS**

The Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis.  In the first four steps, Plaintiff had to show that:

(1)    he was not presently engaged in substantial gainful employment; and

(2)    he suffered from a severe impairment; and

(3)    the impairment met or was medically equal to a "listed impairment;" or

-14-

       (4)     he did not have the residual functional capacity (RFC) to perform his relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(e); 20 C.F.R. § 416.920(a)-(e). If Plaintiff's impairments prevented him from doing his past work, the Commissioner would, at step five, consider his RFC, age, education and past work experience to determine if he could perform other work. If not, he would be deemed disabled. 20 C.F.R. § 404.1520(f). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Id.* (citations omitted).

### C.    <u>ARGUMENT</u>

Plaintiff challenges the ALJ's non-disability finding by asserting that the ALJ improperly discounted her credible claims of disabling pain and fatigue caused by her fibromyalgia and mental impairments and which resulted in her need to nap and lie on the floor to stretch, and in her difficulties with concentration.

Fibromyalgia is defined as follows:

> A syndrome of chronic pain of musculoskeletal origin but uncertain cause. The American College of Rheumatology has established diagnostic criteria that include pain on both sides of the body, both above and below the waist, as well as in an axial distribution (cervical, thoracic, or lumbar spine or anterior chest); additionally there must be point tenderness in at

least 11 of 18 specified sites.

*Stedman's Medical Dictionary*, 27th Ed., 2000, at 671.  Fibromyalgia is a "mysterious" and "elusive" disease with no known cure.  *Swain v. Comm'r of Soc. Sec.*, 297 F. Supp. 2d 986, 990 (N.D. Ohio 2003), citing *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996).  It is also a disease of exclusion and is often diagnosed only after ruling out "other medical conditions which may manifest fibrositis-like symptoms of musculoskeletal pain, stiffness, and fatigue."  *Green-Younger v. Barnhart*, 335 F.3d 99, 109 (2d Cir. 2003), quoting *Preston v. Sec. of Health & Human Srvs.*, 854 F.2d 815, 819 (6th Cir. 1988).  Generally, no laboratory test can confirm its presence or severity and physical examinations usually yield normal findings such as a full range of motion, no joint swelling, normal muscle strength, and normal neurological reactions.  *Preston*, 854 F.2d at 818; *Sarchet*, 78 F.3d at 306.

Fibromyalgia by itself can be disabling.  *See Preston*, 854 F.2d 815. However, because its symptoms are entirely subjective, they are easy to fake.  *Sarchet*, 78 F.3d at 306.  As the *Sarchet* Court noted "some people may have such a severe case of fibromyalgia as to be totally disabled from working . . . but most do not and the question is whether [claimant] is one of the minority.  *Id.* (citations omitted).

The *Preston* Court detailed certain objective factors that support a finding of disability due to fibromyalgia, including: (1) opinions from a claimant's physician regarding the severity of her condition; (2) a referral to a rheumatologist for an evaluation, to a pain clinic, and to a physical therapist; (3) injection of claimant's focal tender points with coritzone or novicaine shots; and (4) hospitalization.  *Id.*

Drawing upon *Preston*, other courts have recognized the importance of an ALJ's credibility findings in these cases. As the *Swain* court noted, the severity of a claimant's fibromyalgia and any resulting limitations depends heavily upon the opinions of claimant's treating physicians, which necessarily depend upon an assessment of the claimant's subjective complaints. *Swain*, 297 F. Supp. 2d at 990. Consequently, "[t]his places a premium . . . in such cases on the assessment of the claimant's credibility. *Id.; see also Brazier v. Sec'y of Health & Human Servs.*, 61 F.3d 903 (6th Cir. 1995) (unpublished); *Potts v. Sec'y of Health & Human Servs.*, 1 F.3d 1241 (6th Cir. 1993 (unpublished). Special deference is owed to the credibility findings of the ALJ, who was the only one who had the opportunity to observe the demeanor of the witness, evaluate what was said and how it was said, and to consider how that testimony fit in with the rest of the medical evidence. Such observation is invaluable and should not be discarded lightly. *Beavers v. Secretary*, 577 F.2d 383 (6th Cir. 1978). *See also Williamson v. Secretary*, 796 F.2d 146, 150 (6th Cir. 1986).

A review of the record as a whole provides substantial evidence to support the ALJ's determination that Plaintiff's fibromyalgia is not disabling. Not surprisingly, the medical records during the relevant period contain little objective medical evidence for crediting Plaintiff's complaints of disabling symptoms that would preclude unskilled, sedentary work. Examination findings generally showed that Plaintiff had a normal gait, a full range of motion and strength in her upper and lower extremities with no muscle atrophy, negative to mildly positive straight leg raising tests, and good hand grip and dexterity. She also had intact sensations and full reflexes. X-rays, EMG reports, and nerve conduction studies were normal. (Tr. 181-83, 209-10, 261, 269-70, 499-500, 504).

-17-

More importantly, a review of the evidence supports the conclusion that Plaintiff's fibromyalgia is not disabling when examined under the *Preston* factors.  Significantly, unlike *Preston*, there is no medical opinion evidence indicating that Plaintiff is disabled or is incapable of performing unskilled, sedentary work.  In fact, one consultative examiner concluded that Plaintiff had no physical impairments and another opined  that Plaintiff could perform a range of light-level work.  The treatment notes document only sporadic, medical care for her physical ailments and no extensive hospitalization.  There is no evidence during the relevant time period that Plaintiff was seen or treated by a rheumatologist, was referred to a pain clinic, or participated in physical therapy.  Her doctors never recommended steroids or epidural injections.[3]  Such conservative treatment is not indicative of severe, disabling symptoms.  *See Villarreal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 464 (6th Cir. 1987).

Substantial evidence also supports the ALJ's determination that Plaintiff's allegations that she could perform no work due to her mental impairments were not fully credible.  (Tr. 31).  There is no medical source opinion indicating that Plaintiff is disabled as a result of her mental impairments.  Rather, Dr. Binkley did not believe that Plaintiff was unable to work due to her mental impairments although she had some moderate difficulties.  Dr. Marshall concluded that Plaintiff had moderate limitations in her ability to maintain social functioning and in maintaining concentration,

---

[3]      Evidence related to time period at issue in Plaintiff's prior claim indicate that Plaintiff had been treated by a rheumatologist for a period of time and had undergone physical therapy for a period of time.  Her rheumatologist noted that Plaintiff was not taking all of her prescribed medication, was tolerating her pain well, and was required to see him only on an as needed basis.  (Tr. 44).  A physical rehabilitation specialist noted that Plaintiff should remain as active as possible but avoid prolonged static positioning and sustained repetitive movement.  (Tr. 44, 192-95).  Although the specialist's notes state that Plaintiff had received epidural injections, which were not effective, there are no records documenting such treatment.

-18-

persistence, or pace but that she could perform unskilled work on a sustained basis.  These limitations were incorporated into the ALJ's RFC.  With one exception discussed below, Plaintiff does not challenge the ALJ's formulation of Plaintiff's RFC finding as to Plaintiff's mental impairments.

Additionally, the record shows that medication helped control Plaintiff's symptoms when taken as directed.  In July 2000 Plaintiff reported that Wellbutrin was working well but she decided to stop taking the medication in September 2000.  (Tr. 242, 245).  After Dr. Harrelson placed Plaintiff back on Wellbutrin, Plaintiff reported that it helped her think more clearly.  (Tr. 351).  Plaintiff reported in 2002 that Paxil and a new medication for her fibromyalgia helped.  (Tr. 434, 437).  In 2004 Dr. Foster reported that Plaintiff's fibromyalgia, depression, bipolar disorder, and mood swings were being well-controlled by her medication.  (Tr. 536).  And, while less persuasive, the record also indicates that Plaintiff was able to attend to her personal care, shop, cook, attend to light household chores, drive, takes trip up to Northern Michigan on the weekends, and care for her young children although not the extent she previously could handle.  (Tr. 125-40, 146-167).

Nevertheless, Plaintiff asserts that the ALJ should have credited her testimony that her impairments necessitated repeated napping and stretching on the floor throughout the day. Substantial evidence in the record supports a conclusion that these allegations were not fully credible.  While doctors did recommend that Plaintiff stretch as a means of coping with her leg and back pain, there is no indication that they believed this treatment was incompatible with an ability to work.  Furthermore, there is no indication that Plaintiff could not accomplish her stretching exercises before and after normal work hours.  The record also does not show that any of Plaintiff's doctors recommended that Plaintiff nap during the day or that Plaintiff was unable to work as a

result of fatigue or a need to nap.  Although Plaintiff reported her napping to doctors, it was their opinion that this was an activity to be avoided and that Plaintiff should work on re-stabilizing and re-structuring her sleep pattern.  Additionally, the record reveals that Plaintiff's difficulties with sleep rested, in part, with her pregnancy and her subsequent need to care for an infant child.[4]  Taken as a whole, the Court concludes that the ALJ's credibility finding is supported by substantial evidence.

Plaintiff also argues that the ALJ's RFC finding and subsequent hypothetical to the VE were faulty because they did not specifically incorporate Dr. Marshall's opinion that Plaintiff had moderate difficulties in performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances.  (Tr. 480).  Plaintiff further contends that had this limitation been adopted by the ALJ, it would have rendered Plaintiff disabled based upon the frequency-based approach used in *Bankston v. Comm'r of Soc. Sec.*, 127 F. Supp. 2d 820 (E.D. Mich. 2000).

The effects of a claimant's mental impairments upon his or her activities of daily living, ability to maintain social functioning, and ability to maintain concentration, persistence, or pace were previously rated on a five-point scale of frequency: never, seldom, often, frequent, and constant.  In *Bankston*, the Court concluded "that a mental deficiency occurring 'often' may not be

---

[4]      There are also statements from Dr. Foster that Plaintiff reported her drowsiness was caused by her medication.  In response, Dr. Foster would either readjust Plaintiff's dosage or type of medication or would simply change when Plaintiff was to take the medication.  There is no indication that Dr. Foster believed Plaintiff's drowsiness was a necessary consequence of her medication or that it rendered her incapable of work.  Indeed, Dr. Foster felt comfortable prescribing these medications despite Plaintiff's need to care for her infant son when alone. Furthermore, at one point, Dr. Foster noted that Plaintiff suffered no adverse symptoms from her medication.  (Tr. 466).

consistent with substantial gainful employment." *Id.* at 826.  The Court further found that the term "often" should logically be defined as 50% of the time.  *Id.* at 827; *see also Edwards v. Barnhart*, 383 F. Supp. 2d 920, 929-31 (E.D. Mich 2005).

After *Bankston*, the regulation was amended to focus the inquiry on the severity, rather than frequency, of the effects of a claimant's mental impairments.  Under 20 C.F.R. § 404.1520(c)(4), the current scale rates severity as none, mild, moderate, marked, and extreme. Plaintiff alleges that "moderate" under the current scale is the equivalent of "often" under the prior scale, presumably because they both fall in the middle of their respective scales.  She then implies that, when combined with the reasoning of *Bankston*, Plaintiff's moderation limitations as noted by Dr. Marshall meant that 50% of the time Plaintiff would unable perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.

To the extent Plaintiff asserts that the ALJ's hypothetical was faulty for its failure to specifically include the limitation "moderately limited in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances", the Court sees no error.   The ALJ was not required to use any "talismanic" language regarding Plaintiff's moderate limitations in maintaining concentration or persistence when fashioning his RFC and subsequent hypothetical.  *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).  An ALJ's RFC assessment and corresponding hypothetical are sufficient if "[t]he ALJ went beyond [a] simple frequency assessment to develop a complete and accurate assessment of . . . [claimant's] mental impairment."  *Id.*  The RFC assessment is a highly individualized analysis dependent upon the facts of any given case.  *Bohn-Morton v. Comm'r of Soc. Sec.*, 389 F. Supp. 2d 804, 807 (E.D. Mich. 2005).

-21-

Although Dr. Marshall concluded that Plaintiff had the moderate limitations noted above, he nevertheless concluded that Plaintiff retained the ability to perform unskilled work on a sustained basis if her difficulty with completing tasks were taken into account and her contact with the public were limited.  The ALJ did account for these limitations in crafting his RFC. Specifically, the ALJ limited Plaintiff to work that involved no detailed instructions, no extended periods of concentration, no fast-paced work (meaning no assembly-line work or work with production quotas), and only occasional contact with supervisors, co-workers, and the public, changes in work setting or procedure, and independent decision-making or planning.

Furthermore, as noted previously, none of Plaintiff's treating doctors opined that Plaintiff had any mental limitations greater than those provide for by the ALJ in his RFC finding. Therefore, the ALJ's RFC finding and subsequent hypothetical adequately reflected Plaintiff's mental impairments that were supported by the credible evidence.[5]

## **RECOMMENDATION**

The Commissioner's decision is supported by substantial evidence.  Plaintiff's Motion for Summary Judgment (Docket # 10) should be **DENIED**.  Defendant's Motion for Summary Judgment (Docket # 15) should be **GRANTED** and the Plaintiff's complaint **DISMISSED**.

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten (10) days of service of a copy hereof as provided for

---

[5]        Furthermore, even if an error had occurred, the Court does not conclude that *Bankston* would necessitate a finding of disability.  There is no Sixth Circuit authority which holds that the terms "often" and "moderate" are interchangeable or that defines "moderate" as meaning a 50% deficit such that the logic of *Bankston* has any clear application to this case.  *See Butler-Wade v. Comm'r of Soc. Sec.*, 2005 WL 361530 *7-8 (E.D. Mich. 2005).

2:06-cv-10051-JF-MKM   Doc # 16   Filed 01/30/07   Pg 23 of 23   Pg ID 693

in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections

constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard*

*v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991).  Filing objections which

raise some issues but fail to raise others with specificity will not preserve all objections that

party might have to this Report and Recommendation.  *Willis v. Secretary*, 931 F.2d 390, 401

(6th Cir. 1991).  Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District*

*Court for the Eastern District of Michigan*, a copy of any objection must be served upon this

Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the

opposing party may file a response.  The response shall be not more than five (5) pages in length

unless by motion and order such page limit is extended by the Court.  The response shall address

specifically, and in the same order raised, each issue contained within the objections.


Dated: January 30, 2007                         s/ Mona K. Majzoub                              
                                                **MONA K. MAJZOUB**

                                                **UNITED STATES MAGISTRATE JUDGE**


**PROOF OF SERVICE**

I hereby certify that a copy of this Report and Recommendation was served upon
Counsel of Record on this date.


Dated: January 30, 2007                         s/ Lisa C. Bartlett                             
                                                **Courtroom Deputy**


-23-